Sᴛᴀᴛᴇ of Wisconsin, Plaintiff-Respondent,

v.

Vaughn Tʜᴜʀᴍᴏɴᴅ, Defendant-Appellant.

Court of Appeals

*No. 03–0191–CR. Oral argument November 17, 2003.—*
*Decided February 3, 2004.*

2004 WI App 49

(Also reported in 677 N.W.2d 655.)

On behalf of the defendant-appellant, the cause was submitted on the brief of *Ann T. Bowe* of Milwaukee, with oral argument by *Ann T. Bowe*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Marguerite M. Moeller*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general, with oral argument by *Marguerite M. Moeller*.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. CURLEY, J. Vaughn Thurmond[1] appeals the judgment convicting him of second-degree sexual assault, and kidnapping as a habitual criminal, contrary to WIS. STAT. §§ 940.225(2)(a), 940.31(1)(b), and 939.62

---

[1] Mr. Thurmond's name is spelled in two different ways throughout the record. For uniformity, we will use the traditional spelling, "Vaughn," throughout this decision.

(2001–02).[2] Thurmond argues that the trial court erroneously exercised its discretion by failing to declare a mistrial after the jury indicated it was deadlocked. He also claims that the trial court erred when, after learning that the jurors believed they were deadlocked and reading them a supplementary instruction urging them to resolve the case, it granted the State's request to instruct the jury on two lesser-included offenses. Because Thurmond never moved for a mistrial, he has waived the right to raise this issue. However, we are satisfied that, under the specific facts of this case, giving the jury post-summation lesser-included offense instructions resulted in unfair prejudice to Thurmond. Consequently, we reverse.

## I. BACKGROUND.

¶ 2. Stefanie P. reported to the police that while she was walking home from work in the late evening of September 8, 2001, a man came up behind her, grabbed her, pressed what she believed to be a knife against her throat, and pushed her across the street into a used car lot. Once there, the man went through her empty pockets, opened a car door, pushed her inside and sexually assaulted her for approximately thirty minutes, all the while holding the knife. After her assailant laid the knife down on the dashboard, she escaped by pushing him, getting up, and running away. She ran to a corner tavern where she saw someone she knew, who then walked her home. Once home, Stefanie P. told a

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

A review of the judgment indicates that Thurmond was found guilty of the use of a dangerous weapon. This is incorrect. He was acquitted of the enhancer charge. On remittitur, the clerk of the circuit court is directed to correct this error.

friend what had occurred. Her friend took her to a local hospital, and the police were called.

¶ 3. Later that same evening, the police took Stefanie P. to the crime scene where she was shown a driver's license issued to Thurmond. She identified the picture on the license as that of her assailant. Several days later, she also picked him out of a lineup. The original criminal complaint charged Thurmond with first-degree sexual assault and kidnapping while armed. At the preliminary hearing, Stefanie P. admitted that while she believed her assailant had a knife, she never actually saw it. She also testified that her assailant asked her for money. Thurmond was bound over for trial.

¶ 4. After the preliminary hearing, the State filed an amended information adding a count of attempted armed robbery to the original charges. A jury trial was eventually held and both Stefanie P. and Thurmond testified. Stefanie P. described the events in a manner similar to her preliminary hearing testimony, except that she now claimed to have seen the knife. Thurmond, on the other hand, claimed that his encounter with Stefanie P. was a romantic one. He testified that they were walking toward each other on the same street and he engaged her in light banter that led to her willingly accompanying him to the car. He vigorously denied ever having or displaying a knife. He told the jury that she consented to having sex with him in the back seat of the car. He described how she removed her own panties and how they had sex in several different positions. He explained to the jury that, after approximately thirty-five minutes, Stefanie P. suddenly acted like she was in a hurry, got up, dressed and left. He claimed that he gave her his name and telephone number on a piece of paper.

481

¶ 5. Following the close of testimony, the trial court held a jury instruction conference. At the conference, the State did not request the court to give any instructions regarding lesser-included offenses. After the instruction conference, the attorneys gave their closing arguments. The jury then began its deliberations on June 24, 2002, at approximately 11:00 a.m. When the jury did not reach a verdict by late afternoon on June 24, the trial court ordered them to resume deliberations at 8:30 a.m. the next day.[3] What occurred during the jury's deliberations on June 25 and June 26 is not entirely clear. What we do know is that the jury sent out several notes to the trial court, but the court failed to either preserve or read all of them into the record, despite its statement that it would do so.[4] On the morning of June 25, the trial court assembled the parties and advised them:

> I have you here because of the questions I have been receiving from the jury. The latest question indicates that [the jury] need[s] to be reinstructed, especially on the reasonable doubt issues. ["]What is the difference between personal and, parentheses, shadow of a doubt and reasonable doubt based on evidence from testimony[?]"

The trial court also remarked:

---

[3] Although the judgment roll mistakenly refers to this date as June 24, 2002, according to the transcripts, the jury continued deliberating on June 25, 2002.

[4] We remind the trial court that unless there is a stipulation to the contrary, WIS. STAT. § 805.13(1) requires the court to record all communications with the jury and, pursuant to case law, a defendant has a right "to be present at trial and to have counsel at every stage where he or she needs aid in dealing with legal problems." *See State v. Koller*, 2001 WI App 253, ¶ 62, 248 Wis. 2d 259, 635 N.W.2d 838.

It appears to me that they are [making every effort to deliberate] because in some of the questions they do indicate – and I will read those questions into the record at the appropriate time, but they do indicate the fact that they are taking votes and what their totals are.

At this point I'm not really sure where they are going with these questions, but I just felt the need to sort of bring them in and reinstruct them on the burden of proof and presumption of innocence[.]

Shortly thereafter, the following colloquy occurred:

[THURMOND'S ATTORNEY]: Judge, you had made reference to two other notes. I'm assuming that you are not going to make reference to those?

THE COURT: Well, I'm not going to make reference to those notes.

. . . .

Essentially the questions – the question before this one indicated that, you know, essentially they were not in complete agreement. I indicated to them that I could reinstruct them, and I believe it's 805 – 805.13(5), which indicates after the jury retires, the court may reinstruct the jury as to all or any part of the instructions previously given and may give supplemental instructions as it deems appropriate, so I indicated to them that I could reinstruct them – reinstruct them, as well as speak to the need to continue deliberations.

[THURMOND'S ATTORNEY]: Thank you.

THE COURT: And then what has resulted is this next question that they somehow need reinstructing on burden of proof. So I'm going to do that, indicate to

them that they are to continue to deliberate, and then just send them back in so they can continue to deliberate.

Following this exchange, the trial court brought the jury into the courtroom, made reference to the questions sent by the jury, and reinstructed them on the definition of reasonable doubt. The jury was then sent back to deliberate.

¶ 6. Some time later on June 25, the trial court re-assembled the parties and advised them that the jury had sent another note:

All right. At this time I've had the matter called. I've indicated that – before the case was called, what the question was, and I'm going to read it into the record at this point. ["]We are still at a standstill on our vote. We have reviewed the evidence, we have discussed, we have backtracked our conversations to make sure we are not speculating and searching for doubt. We have three jurors who find Stefanie P[.]'s credibility in question. We know you want us to deliberate, but we need a new way to approach deliberations to move us forward.["]

Following receipt of this question, the trial court decided to read the supplemental jury instruction, Wis JI—Criminal 520, which urges the jury to try to resolve the case. No objection was made to the trial court's proposed instruction and the trial court instructed the jury accordingly.

¶ 7. Several hours later, the trial court went back on the record stating that it was 4:00 p.m. on the second day of deliberations, and noting that the jury had indicated that it answered one of the verdict questions. The bailiff informed the court that the jury indicated that it needed more time to deliberate. After this discussion, the trial court went back on the record and

announced that the State was moving the court to instruct the jury on lesser-included offenses. The State wished to have the trial court read the jury instruction for second-degree sexual assault, as a lesser-included offense of first-degree sexual assault, and the jury instruction for attempted strong arm robbery, as a lesser-included offense of attempted armed robbery.

¶ 8. In granting the State's motion, the trial court revealed for the first time that the jury had previously inquired about lesser-included offenses:

> I'll indicate that as they've been deliberating for about 14 hours, there was a question with respect to the – the jury had a question with respect to the lesser included. My response at that time was that it is not a proper instruction, but at this time now the State has moved for the lesser included.

The next morning, which began the third day of deliberations, the trial court read the jury the instructions for the lesser-included offenses and gave them additional verdict forms over Thurmond's objection. With respect to additional argument by counsel, Thurmond objected to any additional closing arguments by either side. His attorney reasoned:

> Judge, as I view the case law, it seems to say that there would be the possibility of further summation by the attorneys or further closing argument by the attorneys, and for strategic reasons I want the record to reflect that we are not asking the Court for that opportunity, specifically because of the questions that have come out of jury deliberations.
>
> It would give counsel for the State, particularly, the opportunity to answer all of those questions, and we don't want that to be done. So I have consulted with Mr.

Thurmond about that, and he definitely does not want me to make any further summations.

Then I just want to restate our objection to the process, and that is primarily because it would seem to be that the jury is likely to take this as an opportunity to possibly – in the Court's view that maybe they would – maybe they should find a lesser offense. Somehow they may feel that this is their out, and that the Court is providing them an out.

The State agreed that no additional argument would be made.

¶ 9. After receiving the new instructions, the jury began deliberating at approximately 11:45 a.m. At approximately 1:30 p.m., presumably after a lunch break,[5] the jury reached a verdict finding Thurmond guilty of second-degree sexual assault and kidnapping, but without the use of a dangerous weapon, and not guilty of attempt armed robbery. Just prior to reading the verdict, the trial court stated that yet another jury question had been sent:

I will indicate that we do have a verdict. There was one question, and the question essentially related to what "seize" meant, and whether or not being held forcibly is the same as being seized. I can't recall the exact wording of the question, but I referred them to the instruction on kidnapping and the third element that defines what "seized" means.

---

[5] In its motion for reconsideration, the State notes that a subsequent review of the circuit court file indicates that the jury did not, in fact, break for lunch. However, this clarification does not materially affect our analysis.

486

The second part of the question was, was this double jeopardy[?] I indicated to them that that is not an issue for deliberations. That is what I left it at, and that was the question.

At this point they have a verdict. Are there any issues that need to be addressed before we bring in the jury?

I will also indicate, too, that I tried to keep some of the questions, but I would answer the question on the same sheet of paper and send it back to them. I had the bailiff inquire as to whether or not they have the questions, and they don't have the questions. So what I'm going to do after the verdict is received, depending on what it is, I will go back and speak with them briefly and I will come back and hear any arguments at that time on any matters.

Following the verdict, Thurmond was sentenced to fifteen years' confinement to be followed by ten years of extended supervision on count one, and ten years of confinement to be followed by twenty years' extended supervision on count two. Thurmond did not bring any postconviction motions.

## II. ANALYSIS.

### A. Thurmond waived his right to argue the trial court should have granted a mistrial.

¶ 10. Thurmond argues that the "trial court committed reversible error in failing to declare a mistrial in [his] case." He posits that when the jury sent a note indicating that it was deadlocked, the trial court, *sua sponte,* should have declared a mistrial. The decision to declare a mistrial is within the sound discretion of the trial court. *State v. Copening*, 100 Wis. 2d 700, 710, 303

487

N.W.2d 821 (1981). When no mistrial is declared, our review of this issue is limited to whether the trial court erroneously exercised its discretion in refusing to do so. *See State v. Pankow*, 144 Wis. 2d 23, 47, 422 N.W.2d 913 (Ct. App. 1988). Here, however, Thurmond failed to move the court for a mistrial. As a consequence, he may not raise this issue on appeal. *State v. Rogers*, 196 Wis. 2d 817, 825–27, 539 N.W.2d 897 (Ct. App. 1995) (failure to raise specific challenges in the trial court waives the right to raise them on appeal); *see also State v. Holt*, 128 Wis. 2d 110, 124–25, 382 N.W.2d 679 (Ct. App. 1985). Moreover, Thurmond cites no law *requiring* a trial court to declare a mistrial on its own motion.

*B. Under the circumstances presented here, the trial court erred when it instructed the jury on the lesser-included offenses.*

¶ 11. Thurmond next argues that the trial court committed reversible error in permitting the post-summation instructions on lesser-included offenses. Thurmond does not dispute the fact that second-degree sexual assault is a lesser-included offense to first-degree sexual assault or that attempted strong arm robbery is a lesser-included offense of attempted armed robbery. Rather, his argument is two-fold: (1) he submits that it was error to give the instructions because lesser-included offense instructions are permitted only when there is a reasonable basis in the evidence for the jury to acquit on the greater offense and to convict on the lesser offense, and here, no reasonable basis existed to acquit on the greater offense and convict on the lesser offense; and (2) he submits that the timing of the giving of the instructions was unfairly prejudicial because the jury had earlier been told that lesser-included instruc-

488

tions were inappropriate, and by giving the lesser-included instructions late in the deliberations, the jury may have felt that the trial court was endorsing a finding of guilt to the lesser-included offenses. We agree with Thurmond's second argument. Because of our decision in this issue, it is not necessary for us to address Thurmond's first argument. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need be addressed).

■

¶ 12. A trial court has wide discretion as to which instructions it will give to a jury. *McMahon v. Brown*, 125 Wis. 2d 351, 354, 371 N.W.2d 414 (Ct. App. 1985). The instructions must fully and fairly inform the jury as to the applicable principles of law. *Runjo v. St. Paul Fire & Marine Ins. Co.*, 197 Wis. 2d 594, 602, 541 N.W.2d 173 (Ct. App. 1995).

> Even if we determine that a circuit court has committed an error in administering a jury instruction, we must assess whether the miscue constitutes reversible error, that is, whether the "substantial rights" of a litigant have been affected. [As such, f]or an error "to affect the substantial rights" of a party, there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue. A reasonable possibility of a different outcome is a possibility sufficient to "undermine confidence in the outcome."

*Nommensen v. American Cont'l Ins. Co.*, 2001 WI 112, ¶¶ 51–52, 246 Wis. 2d 132, 629 N.W.2d 301 (citations and footnote omitted).

¶ 13. Wisconsin Stat. § 972.01 directs that the same rules regarding juries apply in criminal jury trials as in civil actions.[6] Wisconsin Stat. § 805.13 sets out the rules regarding jury instructions in civil actions. Wisconsin Stat. § 805.13(5) authorizes the trial court to reinstruct the jury after deliberations have begun: "After the jury retires, the court may reinstruct the jury as to all or any part of the instructions previously given, or may give supplementary instructions as it deems appropriate." Thus,

> as a general rule, it is within the province of the court to recall a jury for supplemental instructions, but it is considered the better practice to admonish the jury not to place undue emphasis on the supplemental instructions and to consider them in conjunction with the entire charge.

*Leach v. State*, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977).

¶ 14. We find little guidance in Wisconsin law on the question raised on this appeal, i.e., can a judge instruct on lesser-included offenses after the jury has been deliberating? Several other jurisdictions have, however, addressed the issue. While it appears that some courts have adopted a *per se* rule establishing that giving a belated lesser-included instruction is prejudicial error, "[t]he weight of state authority holds that it

---

[6] Wisconsin Stat. § 972.01 provides:

**Jury; civil rules applicable.** The summoning of jurors, the selection and qualifications of the jury, the challenge of jurors for cause and the duty of the court in charging the jury and giving instructions and discharging the jury when unable to agree shall be the same in criminal as in civil actions, except that s. 805.08 (3) shall not apply.

would not be appropriate to adopt a *per se* rule which would declare the belated giving of any [lesser included offense] instruction to be prejudicial error."[7] *See United States v. Welbeck*, 145 F.3d 493, 496 (2d Cir. 1998) (citation omitted). All courts have expressed some concern with this procedure. In examining the issue, we first adopt the view stated in *State v. LaPierre*, 2000 ME 119, ¶ 21, 754 A.2d 978, that "[a] reinstruction presenting for the first time choices for lesser included offenses not presented in the initial instructions, if proper at all, would be a rare event, only done in exceptional circumstances."

¶ 15. The dangers of permitting post-summation lesser-included offense instructions are many. In *Welbeck*, the court noted: "The principal concern in such circumstances [is] that the stalled jury may regard the newly furnished theory of liability as the court's recommendation to resolve the impasse by agreeing to the lesser offense."[8] 145 F.3d at 497. Courts have cautioned against the practice:

"[T]he practice . . . should be used with great circumspection, for the obvious reason that jurors, who have

---

[7] At oral argument, Thurmond contended that this court should adopt a *per se* rule that giving a belated lesser-included offense instruction is prejudicial error. We decline to do so.

[8] In *United States v. Welbeck*, 145 F.3d 493 (2d Cir. 1998), the trial court noted that this concern was not relevant when the jury raised the question on its own, as was the situation in that case. However, from the perspective of a juror, we can see no discernable difference between a situation when the judge decides to give the lesser-included instructions on its own and the situation here, when the trial court granted the state's request for the lesser-included instructions, as the jury would not know whether a request had been made or the trial court elected to give them on its own.

deliberated long upon a case, will be apt to seize on a belated instruction and give it more than its proper proportionate significance." Or as stated by another court: "The natural tendency of calling the attention of the jury specially to a certain legal principle upon which the case of one of the parties may especially depend is to magnify in the eyes of the jury any evidence which may have been adduced which is pertinent to that particular principle, and to stress the contention of one party, who may have relied upon it, to the manifest injury to the opposite party."

*State v. Anderson,* 185 S.E. 212, 214 (W. Va. 1936) (citations omitted). Stated differently, one court, commenting on the problems post-summation instructions breed, indicated:

Moreover, the jury might very well have considered the last instruction as an intimation of the desire of the court that the defendant be convicted of some offense. Jurors exhausted by a long confinement, and naturally desirous of being released, are not in a suitable frame of mind to thoroughly consider an entirely new phase of the case under a new instruction which might fairly be construed as an expression of the court hostile to the defendant.

*State v. Amos,* 553 S.W.2d 700, 703 (Mo. 1977) (en banc).

¶ 16. A third danger arising from this practice that could require reversal is when "the defendant has somehow been harmed by his reasonable expectation that he faces exposure to liability only for the greater offense charged." *Welbeck,* 145 F.3d at 497.

¶ 17. Summarizing, then, courts have reversed cases when post-summation lesser-included offense instructions were given: when it appeared likely that the jury saw the belated instructions as a court recommendation to convict; when the timing of the instruc-

tions makes the new instruction appear overly significant, upsetting the orderly process of the trial and upsetting the defendant's right to a fair trial; when the defendant's presentation of his case is harmed; and when circumstances suggest the verdict was driven by a stalled jury's desire to disband rather than complete a fair assessment of the evidence. With that backdrop in mind, we conclude that giving the lesser-included offense instructions was unfairly prejudicial here.

¶ 18. In many of the cited cases, the jury had either been deadlocked or experiencing difficulty in reaching a verdict before receiving the lesser-included offense instructions. *See, e.g., People v. Jennings*, 99 Cal. Rptr. 739 (Ct. App. 1972); *People v. Stouter*, 75 P. 780 (Cal. 1904). Here, the trial court decided to give the new jury instructions after the jury had been deliberating for over fourteen hours and had expressed an inability to reach a verdict.

¶ 19. In many of the cases touching on the issue, the judge instructed the jury regarding lesser-included offenses on its own initiative, but in some others, the jury initiated the post-summation lesser-included offense instruction. In the present case, the jury's request for lesser-included offense instructions was originally rebuffed by the trial court, and was only resurrected when the State requested them. We must conclude that this change of heart by the trial court would lead a reasonable jury to believe that the trial court was now endorsing the new instructions. A juror might reasonably ask: why else would they be improper earlier, but proper now? The trial court's actions essentially created an environment where "[a] stalled jury may regard the newly furnished theory of liability as the court's recommendation to resolve the impasse by agreeing to the lesser offense." *Welbeck,* 145 F.3d at 497.

¶ 20. Additionally, the jury's relatively speedy return of its verdict suggests that not much time was spent examining the evidence in light of the new instructions. The rapid return of the verdict implicates another of the concerns voiced about this practice — the verdict may have been driven more by a stalled jury's desire to be released from its duty than its having reached a fair decision. A jury experiencing difficulty in deliberating may find the giving of a lesser-included offense instruction "coercive or at least persuasive . . . to convict of the newly-submitted offense. And it is reasonable to think that a jury could view the later instruction as an easy way out of their difficulties in reaching a decision." *Amos*, 553 S.W.2d at 704.

¶ 21. Other facts add to our concerns. The jury's communication that it felt deadlocked and "needed a new way to deliberate" points to the conclusion that the jury used the new offenses as a way of ending their deadlock rather than reaching a unanimous decision.[9]

¶ 22. The State submits that the problem the jury had in reaching a verdict was cured by the lesser-included offense instruction, but that does not square with what the jury relayed to the court. The note sent by the jury indicated that three jurors questioned the "credibility of the victim." This note did not state that three jurors were unsure of whether a knife was used in the attack, but rather, that they did not believe the victim. Questioning the victim's credibility could implicate any number of concerns besides the uncertain existence of a knife. Those jurors might have wondered

---

[9] One might argue that the jurors felt no coercive pressure because it found Thurmond not guilty of one of the lesser-included offenses, but as we learned later, the jury had already found Thurmond not guilty of the robbery charge when the belated instructions were given.

whether there was actually an assault at all, or whether the manner in which it occurred or was described by the victim was believable. Thus, the note from the stalled jury does not support the State's view.

¶ 23. Indeed, even if the jurors' concerns over Stefanie P.'s credibility had to do with the existence of a knife, in a strikingly similar case, a Texas court reversed the trial court's decision to give a post-summation lesser-included instruction concerning a knife. *See generally Garza v. State*, 55 S.W.3d 74 (Tex. Ct. App. 2001). In that case, Garza was charged with aggravated kidnapping. The victim, Garza's ex-girlfriend, claimed that Garza forced her into her truck at knifepoint and held her for several hours. Other witnesses testified that they observed Garza force the victim into the truck, but "could not conclusively say that [Garza] held a knife while doing so." *Id.* at 76. Somewhat similar to the facts here, while the jury was deliberating, it sent out a note stating that nine people would find Garza guilty, and three would find him not guilty. In *Garza*, however, the note indicated that the problem was determining whether Garza actually had the knife in his possession. The judge then instructed the jury on the lesser-included offense of kidnapping, over Garza's objection, and the jury convicted him. In reversing, the appellate court said:

> Appellant's trial counsel could have requested the inclusion of a charge on kidnapping, but he made a tactical decision not to do so. In his closing argument, counsel stressed that the victim had not been taken without her consent, and that a knife was not used. The jury's note clearly shows that the jury was hung on the issue of whether appellant used a knife in the offense. The trial court's decision to supplement the charge with the kidnapping charge effectively overrode the professional judgment of appellant's counsel that there was

495

not enough evidence to convict appellant on the aggravated kidnapping charge and that the jury would have to acquit him.

*Id.* at 74.

¶ 24. Here, Thurmond's attorney argued in closing that Stefanie P.'s account could not be true because had Thurmond held a knife to her throat for a period of time longer than a half an hour, the knife would have left some marks or cuts on her neck, and there were none. In addition, his attorney questioned whether it was possible for someone to hold a knife in his hand for the entire length of the sexual assault. Apparently, Thurmond's strategy was to question the existence of the knife in order to challenge the truthfulness of Stefanie P.'s account of the incident. Like the situation in *Garza,* we believe that permitting the State to have additional jury instructions read to the jury that rebut the very points the defense made in closing arguments is unfair. Our system of justice permits the State to challenge the defendant's closing arguments in its rebuttal. It should not permit the State also to ask for additional substantive instructions once it realizes why the jurors may be experiencing difficulties in reaching a verdict.

¶ 25. Thus, the turnabout by the trial court in deciding to give the lesser-included instructions strongly suggests that the jury may have believed the trial court was recommending the finding of guilt to the lesser-included offenses. Further, the stalled jury's failure to reach a verdict until shortly after the post-summation jury instructions arouses suspicion that the jury failed to thoughtfully consider the lesser-included offenses and, instead, was driven by a desire to be released. Finally, Given Thurmond's defense theory, we

believe Thurmond's right to a fair trial was compromised by the acts that occurred here.

¶ 26. For all of the reasons stated, we reverse Thurmond's convictions and remand for a new trial.[10]

*By the Court.*—Judgment reversed and cause remanded.

¶ 27. SCHUDSON, J. *(concurring in part; dissenting in part.)* For the most part, the majority has offered a thoughtful analysis with which I agree. In particular, I join in emphasizing that, although a supplemental lesser-included instruction " 'would be a rare event, only done in exceptional circumstances,' " majority at ¶ 14, we accept " '[t]he weight of state authority hold[ing] that it would not be appropriate to adopt a *per se* rule which would declare the belated giving of any [lesser included offense] instruction to be prejudicial error,' " *id.* Here, however, I depart from the majority's application of the principles it adopts.

¶ 28. In this case, the devil may indeed be in the details and, unfortunately, some of those details are yet unknown. Let us begin, therefore, by identifying two points where the majority's factual summary may be significantly misleading.

### 1. The Trial Court's "Response"

¶ 29. The majority writes:

---

[10] While challenging the kidnapping charge was not the main thrust of Thurmond's brief, he has challenged the overall fairness and integrity of the trial, and it is the view of this court that the post-summation instructions on lesser-included offenses tainted all of the verdicts in this case. As has been set forth in this decision, the trial court's post-summation instructions implicate a number of concerns, and we cannot conclude that the jury's verdict on the kidnapping charge was wholly insulated from any taint.

> In the present case, the jury's request for lesser-included offense instructions was originally rebuffed by the trial court, and was only resurrected when the State requested them. *We must conclude that this change of heart by the trial court would lead a reasonable jury to believe that the trial court was now endorsing the new instructions.* A juror might reasonably ask: why else would they be improper earlier, but proper now?

Majority at ¶ 19 (emphasis added). Based on the record, however, we need not conclude that at all.

¶ 30. As the majority acknowledges, the factual foundation for its speculation is the trial court's comment: "I'll indicate that as they've been deliberating for about 14 hours, there was a question with respect to the—the jury had a question with respect to the lesser included. My response at that time was that it is not a proper instruction . . . ." But the record does not establish that the trial court's "response" was ever communicated to the jury; what the court wrote to the jury is unknown. The trial court's "response" may well have been its feeling or conclusion, never directly conveyed to the jury.

¶ 31. But, of course, now I am speculating. And while my surmise seems sound, given the absence of anything in the record reflecting any communication to the jury on this point, my view remains blurred. And, for the reasons the majority explains, exactly what occurred may be very important. So, I would ask: What exactly was the jury's question? Did the trial court answer it? If so, did the trial court state (to the jury in the courtroom or in written reply to its question) that *it would be improper* to consider lesser-included offenses?

¶ 32. The answers are out there; the trial judge may have most of them. So much is at stake in this very

498

close case; resolution may depend on a more certain understanding for which an evidentiary hearing would be needed. I suggest we take the time, remand for that hearing, carefully consider exactly what took place, and get it right.[1]

## 2. The Victim's Credibility

¶ 33. The majority also writes: "The note sent by the jury indicated that three jurors questioned the 'credibility of the victim.' This note did not state that three jurors were unsure of whether a knife was used in the attack, but rather, that *they did not believe the victim.*" Majority at ¶ 22 (emphasis added). No, that is not what the note said. *Reading the note as written,* we do not know: (1) what those three jurors were thinking; (2) whether their questioning of the victim's credibility related to whether a knife was used; (3) whether their questioning related to something else; and (4) whether their questioning ultimately would have resulted in their disbelief of the victim and, if so, about

---

[1] Regretfully, once again, we find it necessary to implore a trial court to conduct its proceedings *on the record. See Coston v. Joseph P.,* 222 Wis. 2d 1, 7 n.5, 586 N.W.2d 52 (Ct. App. 1998) ("Here, as in all too many cases, the record is seriously deficient and a circuit court's off-the-record informality has undermined the process of appellate review. While we recognize the many temptations to indulge in off-the-record proceedings, we again urge resistance to temptation."). And, in doing so, I emphasize that we understand the real world of the trial courts. The four judges of this district have more than fifty years' experience as trial court judges. We know the logistical challenges of the courtroom—whether positioning court reporters so they can record bench conferences, or calling attorneys back to court to consider jury questions. We know it "ain't easy," but we also know it can and must be done.

what. Thus, the majority sets another significant point of speculation on a very shaky pedestal.

### 3. Conclusion

¶ 34. I conclude, therefore, that remand for further factual development may be essential to the fair resolution of this appeal. If, however, I must decide based on the present record, I would affirm, consistent with the reasoning of *United States v. Welbeck*, 145 F.3d 493 (2d Cir. 1998).

¶ 35. Here, as in *Welbeck*: (1) the jury's question may have provided the initial impetus for the trial court's consideration of the supplemental instruction; (2) Thurmond was not prejudiced, given that his consent defense, if believed, would have defeated an allegation of either first or second-degree sexual assault; (3) the trial court allowed defense counsel the chance to offer additional closing argument; and (4) a failure to offer the supplemental instruction could have defeated the ends of justice—a verdict resolving the case for both parties.

¶ 36. To gain a new trial, Thurmond was required to establish that, by providing the supplemental instruction, the trial court erroneously exercised discretion or erred as a matter of law and, as a result, that he was prejudiced by the instruction. *See State v. Randall*, 222 Wis. 2d 53, 59–60, 586 N.W.2d 318 (Ct. App. 1998) (Our review is limited to whether the trial court acted within its discretion and we will reverse only if the instructions, taken as a whole, communicated an incorrect statement of the law or otherwise probably misled the jury.); *see also State v. Simplot*, 180 Wis. 2d 383, 404, 509 N.W.2d 338 (Ct. App. 1993) (Just as the initial jury instructions are within the trial courts discretion, so,

too, is the necessity for, the extent of, and form of re-instruction in response to requests or questions from the jury.) (quoted source omitted). Thurmond has failed to establish either an erroneous exercise of discretion, an error as a matter of law, or prejudice.

¶ 37. Accordingly, I conclude, the trial court's decision to provide the lesser-included instruction was consistent with its authority, under WIS. STAT. § 805.13(5): "After the jury retires, the court may reinstruct the jury as to all or any part of the instructions previously given, or may give supplemental instructions as it deems appropriate." Thus, while in some respects I concur, in others I respectfully dissent.